# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

ATLAS DATA PRIVACY CORPORATION, *as assignee of individuals who are Covered Persons,* PATRICK COLLIGAN, and PETER ANDREYEV,

*Plaintiffs,*

v.

DARKOWL, LLC, RICHARD ROES 1-10, *fictitious names of unknown individuals and* ABC COMPANIES 1-10, *fictitious names of unknown entities,*

*Defendants.*

Case No.: 1:24-cv-10600

Civil Action

---

## DARKOWL, LLC'S OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION TO DISMISS COUNTERCLAIMS PURSUANT TO RULE 12(b)(6)

---

**GREENSPOON MARDER LLP**
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com

*Attorneys for Defendant Darkowl, LLC*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................1

FACTUAL BACKGROUND ....................................................................3

LEGAL STANDARD ..............................................................................7

ARGUMENT ..........................................................................................8

I.    DarkOwl Alleges a Colorable Claim for Relief under CROA ......................8

    A.    Atlas Violated CROA Through Its Actions ...................................... 10

        i.    Atlas Accessed DarkOwl's Computer Systems, Took Data Without Authorization, and Obtained DarkOwl's Data Recklessly .............................................................................11

        ii.   Atlas Accessed and Recklessly Damaged a Computer System via a Mass Email Campaign ...................................................15

    B.    Damaging Business or Property Is Plausibly Pled............................. 17

II.   DarkOwl Alleges a Colorable Claim for Relief for Tortious Interference ...20

    A.    Reasonable Expectation of Economic Benefit is Plausibly Pled ....... 20

    B.    Malicious Interference by Atlas is Sufficiently Pled ........................ 23

    C.    Resulting Losses is Plausibly Pled ................................................... 24

III.  Atlas's Engaged in at Least Three Fraudulent Schemes Against DarkOwl..26

    A.    Atlas's Falsely Represented that DarkOwl is a Data Broker............. 31

    B.    Atlas Made False Representations as Part of Its Massive DDoS Email Attack Against DarkOwl.................................................................. 33

    C.    Atlas Gained Access to DarkOwl's Platform and Obtained Data via Fraud............................................................................................ 35

    D.    Damages ....................................................................................... 36

IV.   The Civil Conspiracy Claim Is Plausible and Derivative of Viable Torts ....37

CONCLUSION ......................................................................................39

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*ADP, LLC v. Ultimate Software Grp., Inc.,*
No. CV168664KMMAH, 2018 WL 1151713 (D.N.J. Mar. 5, 2018)..................25

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .........................................................................................7, 22

*Astor Chocolate Corp. v. McCall,*
No. 3:16-CV-5010-BRM-TJB, 2017 WL 2364197 (D.N.J. May 31, 2017)........14

*Austar Int'l, Ltd. V. Austarpharma LLC,*
425 F. Supp. 3d 336 (D.N.J 2019)................................................................ 21, 24

*Auto. Res. Mgmt. LLC v. Favo,*
No. CV 21-2630 (SRC), 2022 WL 1080991 (D.N.J. Apr. 11, 2022) .................11

*Automated Salvage Transp., Inc. v. NV Koninkliijke KNP BT,*
106 F. Supp. 2d. 606 (D.N.J. 1999).....................................................................31

*Avaya Inc., RP v. Telecom Labs, Inc.,*
838 F.3d 354 (3d Cir. 2016) ....................................................................... *passim*

*B&M Auto Salvage & Towing, LLC v. T'ship of Fairfield,*
C.A. No. 11–2107, 2013 WL 5434717 (D.N.J. Sept. 13, 2013).........................26

*Banco Popular N. Am. v. Gandi,*
184 N.J. 161 (2005) ........................................................................................7, 37

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ............................................................................................29

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .......................................................................................7, 22

*Bramshill v. Pullen,*
No. cv 19-18288, 2020 WL 4581827 (D.N.J. Aug. 10, 2020)............................19

*Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring,*
441 F. Supp. 3d 23 (D.N.J. 2020) ................................................................. *passim*

*CC Ford Grp. W. LLC v. Johnson,*
C.A. No. 22-4143 (MAS)(TJB), 2025 WL 1810206 (D.N.J June 30, 2025) ....... 19

*Chaudhri v. Lumileds LLC,*
No. CV182167KMCLW, 2018 WL 6322623 (D.N.J. Dec. 3, 2018) ................. 30

*Connelly v. Lane Constr. Corp.,*
809 F.3d 780 (3d Cir. 2016) ...................................................... 15, 19

*Craftmatic Sec. Litig. v. Kraftsow,*
890 F.2d 628 (3d Cir. 1989) ...................................................................... 8

*Doe v. Princeton Univ.,*
30 F.4th 335 (3d Cir. 2022) .................................................................. 7, 15

*Ewing v. Cumberland Cnty.,*
152 F. Supp. 3d 269 (D.N.J. 2015) ......................................................... 37

*Fairway Dodge, L.L.C. v. Decker Dodge, Inc.,*
191 N.J. 460 (2007) ................................................................................. 9

*Ferring Pharms. Inc., v. Watson Pharms., Inc.,*
No. 2:12-cv-05824, 2014 WL 12634303  (D.N.J. Aug. 14, 2014) ..................... 12

*Fidlar Techs. v. LPS Real Estate Data Solutions, Inc.,*
810 F.3d 1075 (7th Cir. 2016) .............................................................. 16

*Fineman v. Armstrong World Indus.,*
980 F.2d 171 (3d Cir. 1992) .................................................................. 21

*Fowler v. UPMC Shadyside,*
578 F.3d 203 (3d Cir. 2009) .................................................................. 19

*Frederico v. Home Depot,*
507 F.3d 188 (3d Cir. 2007) .................................................................. 28

*Gaetano v. Gilead Sciences, Inc.,*
    529 F. Supp. 3d 333 (2021) ....................................................................14

*Geherty v. Moore,*
    238 N.J.Super. 463 (App. Div. 1990)....................................................31

*Grant v. Turner,*
    505 Fed. Appx. 107 (3d Cir. 2012) ........................................................28

*Great Lakes Rubber Corp. v. Herbert Cooper Co.,*
    286 F.2d 631 (3d Cir. 1961) ...................................................................39

*Hauptmann v. Wilentz,*
    570 F. Supp. 351 (D.N.J. 1983)..............................................................14

*Heartland Payment Sys., LLC v. Carr,*
    No. 318CV09764BRMDEA, 2021 WL 302918 (D.N.J. Jan. 29, 2021).............22

*Hillsborough Rare Coins, LLC v. ADT LLC,*
    No. CV 16-916 (MLC), 2017 WL 1731695 (D.N.J. May 2, 2017) ....................38

*In re Adams Golf, Inc. Securities Litigation,*
    381 F.3d 267 (2004) ...............................................................................13

*In re Nickelodeon Consumer Priv. Litig.,*
    827 F.3d 262 (3d Cir. 2016) ...................................................................18

*Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.,*
    679 F. Supp. 3d 53 (D.N.J. 2023)...........................................................23

*Intervet, Inc. v. Mileutis, Ltd.,*
    No. CV151371FLWTJB, 2016 WL 740267 (D.N.J. Feb. 24, 2016)..................22

*Jewish Center of Sussex County v. Whale,*
    86 N.J. 619 (1981) .................................................................................30

*Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.,*
    665 F. Supp. 2d  (D.N.J. 2009).............................................................11

*Jutrowski v. Twp. of Riverdale,*
904 F.3d 280 (3d Cir. 2018) ............................................................37

*Lamorte & Co. v. Walters,*
167 N.J. 285 (2001) ........................................................................23

*Mortellite v. Novartis Crop Prot., Inc.,*
460 F.3d 483 (3d Cir. 2006) ............................................................31

*N.J. Physicians United Reciprocal Exch v. Boynton and Boynton, Inc.,*
141 F. Supp. 3d 298 (D.N.J. 2015)....................................................21

*P.C. of Yonkers, Inc. v. Celebrations! The Party And Seasonal Superstore,*
No. CIV.A.04-4554 JAG, 2007 WL 708978 (D.N.J. Mar. 5, 2007)...............8, 10

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC.,*
428 F.3d 504 (3d Cir. 2005) ..............................................................8

*Phillips v. County of Allegheny,*
515 F.3d, 224 (3d Cir. 2008) ..............................................................7

*Printing Mart-Morristown v. Sharp Electronics,*
116 N.J. 739 (1989) ...................................................... *passim*

*Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.,*
648 F.3d 295 (6th Cir. 2011) .............................................................16

*Rodgers Grp., LLC v. Lewis,*
No. CV 22-482 (MAS) (TJB), 2022 WL 4095785 (D.N.J. Sept. 7, 2022) ..........13

*Rolo v. City Inv. Co. Liquidating Trust,*
155 F.3d 644 (3d. Cir. 1998) .............................................................28

*Somers Constr. Co. v. Board of Educ.,*
198 F. Supp. 732 (D.N.J. 1961)............................................................7

*State v. Carbone,*
17 N.J.Super. 446 (1952).................................................................38

*State v. Simon,*
  161 N.J. 416 (1999) ........................................................................9, 15

*Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.,*
  292 F.3d 384 (3d. Cir. 2002) .................................................39

*U.S. v. Mosberg,*
  866 F. Supp. 2d 275 (2011) ...................................................38

*United States v. Carlson,*
  209 F. App'x 181 (3d Cir. 2006) ...........................................16

*United States v. One 1973 Rolls Royce,*
  43 F.3d 794) (3d. Cir. 1994)..................................................34

*United States v. Rivera,*
  944 F.2d 1563 (11th Cir. 1991) .............................................34

*United States v. Wert-Ruiz,*
  228 F.3d 250 (3d Cir. 2000) ..................................................35

*Universal Health Services, Inc. v. U.S.,*
  579 U.S. 176 (2016) ..............................................................29

*Varacallo v. Massachusetts Mut. Life Ins. Co.,*
  332 N.J. Super. 31 (App. Div. 2000)................................. 30, 35

*Velop, Inc. v. Kaplan,*
  301 N.J. Super. 32 (App. Div. 1997)......................................23

*Victaulic Co. v. Tieman,*
  499 F.3d 227 (2007) ..............................................................13

*Woodend v. Lenape Regional High School Dist.,*
  535 Fed. App'x 164 (3d Cir. 2013) ........................................26

## Statutes

18 U.S.C. § 1030(4) ...............................................................17

N.J.S.A. § 2A:38A ........................................................................................11

N.J.S.A. § 2A:38A-1 ..................................................................................8, 15

N.J.S.A. § 2A:38A-2 ....................................................................................17

N.J.S.A. § 2A:38A-3 ............................................................................... *passim*

N.J.S.A. § 2C:5-2 ........................................................................................38

**<u>Rules</u>**

Fed. R. Civ. P. 8 .................................................................. 10, 12, 19, 37

Fed. R. Civ. P. 9 ............................................................................. *passim*

Fed. R. Civ. P. 12 ........................................................................... *passim*

Fed. R. Civ. P 13 ........................................................................................39

## **PRELIMINARY STATEMENT**

DarkOwl's mission is public safety. DarkOwl helps keep people safe. It provides a secure platform for vetted law enforcement, government agencies, and cybersecurity professionals to monitor and assess dark web threats. This work helps prevent and disrupt dangerous activity, thereby protecting individuals, including "Covered Persons." Atlas's impermissibly sweeping, for-profit weaponization of Daniel's Law undermines that important mission and makes New Jersey residents less safe.

Atlas's actions give rise to the claims brought against it for: (1) violating the New Jersey Computer Related Offenses Act ("CROA"), (2) tortiously interfering with DarkOwl's business, (3) committing fraud, and (4) conspiracy.

Atlas improperly asks the Court to disregard well-pled factual allegations and reasonable inferences, and to dismiss DarkOwl's Counterclaims based upon an asserted lack of evidentiary proof at the pleading stage. The proper standard requires plausibility, not evidentiary proof. DarkOwl's claims easily meet this standard.

First, DarkOwl plausibly pled that Atlas took several actions that violated CROA. Atlas knowingly, intentionally, and in a reckless manner, accessed—without authorization—DarkOwl's non-public and strictly restricted platform, causing harm to DarkOwl. Atlas took data from DarkOwl without authorization. Atlas also orchestrated and transmitted approximately 48,000 nearly-identical emails

beginning the day before New Year's Eve to intentionally overwhelm DarkOwl's servers and frustrate the 10-day statutory deadlines. This mass email campaign is akin to a malign Distributed Denial of Service ("DDoS") attack and caused, among other things, system disruption, business interruption, diversion of resources, and economic loss.

Second, DarkOwl plausibly pled tortious interference. Atlas's fraudulent misrepresentations and attack were designed to overwhelm DarkOwl's systems, disrupt operations, interfere with and harm DarkOwl's business, and it did. Atlas's calculated actions triggered, amongst others, operational disruption and business interference; reputational damage; resource diversion; and business and revenue losses tied to current and future business, including identified customers.

Third, DarkOwl plausibly pled fraud with particularity. Atlas made material factual misrepresentations, including (a) falsely labeling DarkOwl a "data broker" and "people search website" that "makes available" personal data to the public, (b) falsely claiming covered-person status for assignors and validity of "nondisclosure requests," and (c) making false statements to access DarkOwl's platform data. Atlas made these material misrepresentations to DarkOwl, the assignors, and the public, on and before December 30, 2023, through January 5, 2024, on Atlas's website and in its emails. The "who/what/when/where/how" are pleaded with sufficient particularity.

Finally, DarkOwl plausibly pled civil conspiracy. Atlas agreed, coordinated, and took steps in furtherance of the above schemes with co-participants. The Counterclaim alleges that Atlas worked with others in this regard as evidenced by the massive, coordinated email flood; its unauthorized system access; and unauthorized obtaining of restricted data — all conduct that is independently actionable. Conspiracy claims require reasonable inferences in favor of DarkOwl at the pleading stage; the conspiracy count is sufficiently pled.

For these reasons, and as further explained herein, Atlas's Motion to Dismiss DarkOwl's Counterclaims must be denied entirely.

## **FACTUAL BACKGROUND**

DarkOwl is an industry-leading provider of cybersecurity and threat intelligence services. It only provides these services to fully vetted and approved institutional and professional customers. Counterclaims ¶¶1, 32–39, 46. DarkOwl's public safety mission is supported by its carefully vetted and approved customers, (i.e. police, law enforcement, and cybersecurity professionals) to whom DarkOwl provides safe access to the darknet and with it the ability to identify risks related to cybersecurity incidents, breaches of networks, identity theft, ransomware, and other illegal activity. *Id.* Atlas has never been a customer of DarkOwl, has never entered into an agreement with DarkOwl, has never consulted with DarkOwl for access to its platform, nor has DarkOwl ever authorized Atlas to access DarkOwl's

restricted platform. *Id.* ¶¶ 38, 42-45. Contrary to Atlas's false allegations, DarkOwl is not a "data broker," it is not in the business of making personal data available "on the web," and it does not operate a public "people search" site; rather, DarkOwl's secure platform is gated by contractual vetting and technical controls. *Id.* ¶¶10, 18, 36–39.[1] Access to DarkOwl's platform and threat intelligence tools are strictly restricted to vetted and approved cybersecurity professionals and institutions. *Ibid.*, *and see Id.* ¶¶43-45, and 53.

Atlas claims, through its own website,[2] to provide services to "Remove Your Personal Data From the Web" and protect people by "removing your information from Google and data broker websites." *Id.* ¶9. Atlas advertises itself as enabling people to "remove your name, home address phone number, family members, and other private details from hundreds of data brokers and people search websites." *Id.*

Beginning in 2023, shortly after amendments to Daniel's Law allowing for the assignment of claims and mandatory damages came into effect, Atlas began recruiting "covered persons" for its services. But Atlas did not send out any Daniel's Law requests at the time it signed up these "covered people," nor within 10-days of sign-up, nor within a month, two, three or even 5 months of sign-up. Instead, Atlas

---

[1] Atlas suggests that DarkOwl's platform assesses or analyzes dark web data. That is incorrect. DarkOwl's platform provides secure access to dark web data, allowing its customers to review original, unaltered content scraped from the dark web.

[2] https://www.atlas.net/.

waited approximately *six-months* until the day before New Year's Eve, after it had amassed approximately 19,000 "assignors," before sending any "nondisclosure requests" under Daniel's Law. *Id.* ¶¶ 8, 13-14, 26-28. Atlas delayed action on behalf of "assignors" until it was ready to launch its scheme to sabotage DarkOwl's business and improperly profit off the "assignors" they recruited and claimed to protect. *Id.* Atlas's actions show it was not concerned about safety.

Atlas provided its recruits with a preset list of alleged "data brokers" to target, created generic autogenerated "nondisclosure requests" without confirming that the tens of thousands of recruits were "Covered Persons," and multiplied the request as many as five times per "individual." Atlas did this without confirming that the requested redactions were for "covered information" and without checking if DarkOwl even had any such information to redact in the first place. *Id.* ¶8-12. Atlas then launched its attack and transmitted approximately 48,000 emails to DarkOwl (not a data broker, not publishing personal information on the web, and not offering people searching) in a compressed window beginning the day before New Year's Eve at ~7,000 per day. *Id.* ¶¶13, 15–27. This mass email spam attack orchestrated by Atlas was akin to a DDoS attack,[3] was sent to burden DarkOwl's systems,

---

[3] A DDoS attack overloads a target server, service, network, or its surrounding infrastructure with a flood of internet traffic disrupting the normal flow and making it unavailable to legitimate users. *See* Counterclaims at n 2.

frustrate the statutory 10-business-day compliance period, cause harm to DarkOwl, and manufacture claims for Atlas. *Id.* ¶¶7-8, 11- 20, 21–22, 27, 31, 47.

Atlas, in coordination with one or more others, obtained unauthorized access to, recklessly accessed, and impermissibly retrieved data from DarkOwl's platform, as evidenced by the ~48,000 email attack and by a platform screenshot embedded in Atlas's Complaint — the latter of which could only have occurred via hacking or fraudulent access, contrary to contractual terms and technical controls. *Id*. ¶¶38, 41–45, 67–73, 81-83. Atlas could not have acted alone.

Atlas intended to cause, and did cause, system and business damage and disruption, harm to DarkOwl's email systems, diversion of resources, loss of customers and revenue, interference with DarkOwl's business and contractual relationships, and ongoing business and reputational harm. *Id.* ¶¶31, 38, 51, 53, 46-47, 57. The massive DDoS attack over New Year's week caused significant business, financial, and systems damages to DarkOwl, as would be expected in responding to the sudden influx of ~48,000 emails from the same unknown email handle aimed at a cyber safety organization. *Id*. These actions were designed to induce reliance. The nearly nonstop transmission of purported legal requests pouring in over the holidays necessitated, among other things, substantial time, resources, technical responses, and mobilization of responsive measures. *Id.* ¶¶26-28, 31, 36, 46-47, 51, 59, 60-62, 76-78. Among other impacts and damages, Atlas's conduct

6

forced DarkOwl to curtail customer engagements and lose business including loss of law enforcement revenue from New Jersey. *Id.* ¶¶ 31, 46–63, 78–85.

## **LEGAL STANDARD**

On a Rule 12(b)(6) motion, the Court must accept all well-pled facts as true and draw all reasonable inferences in the non-movant's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Phillips v. County of Allegheny*, 515 F.3d, 224, 231 (3d Cir. 2008). A claim must be facially plausible; plausibility is not probability and does not demand detailed facts or evidentiary proof. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56; 570 (2007). A claim survives if it alleges sufficient factual content to suggest the required elements or raises a reasonable expectation that discovery will uncover evidence supporting them. *Id.*; *Phillips*, 515 F.3d at 234. Accordingly, where the allegations, liberally construed, suggest a viable cause of action, dismissal is improper. *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 165-66 (2005).

Courts do not weigh evidence, resolve fact disputes, nor choose between competing inferences in pleadings. *Iqbal*, 556 U.S. at 696; *Doe v. Princeton Univ.*, 30 F.4th 335, 344 (3d Cir. 2022). Nor do they decide if claims can ultimately prevail on the merits. *Somers Constr. Co. v. Board of Educ.*, 198 F. Supp. 732, 734 (D.N.J. 1961); *Printing Mart-Morristown v. Sharp Electronics*, 116 N.J. 739, 746 (1989).

Fraud claims must satisfy Rule 9(b) by pleading the who, what, when, where, and how, but courts apply the rule with practicality, permitting allegations based on

information uniquely in counterclaim defendants' (here Atlas's) possession to be pled on belief. *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).

## ARGUMENT[4]

## I.    DarkOwl Alleges a Colorable Claim for Relief under CROA

DarkOwl sufficiently pled Atlas violated New Jersey's Computer Related Offenses Act, N.J.S.A. § 2A:38A-3 ("CROA"). For relief under CROA, a party need allege: (1) at least one of the five listed actions delineated in the statute, and (2) damage to business or property resulting therefrom. N.J.S.A. § 2A:38A-3 (a)-(e); *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC.*, 428 F.3d 504, 508–09 (3d Cir. 2005).[5]  CROA provides a cause of action based on "purposeful or knowing, and":

> a.  unauthorized altering, damaging, taking or destruction of any data, database, computer program, [software or equipment];[6]

---

[4] DarkOwl is <u>not</u> retaliating against Covered Persons/Individual Plaintiffs as Atlas suggests. Its Counterclaims are based on Complaint allegations and misconduct by Atlas. Where the Complaint distinguishes between Atlas and Individual Plaintiffs, DarkOwl does the same. To the extent others rely on or benefit from unlawful conduct undertaken by Atlas, the Counterclaims are meant to avoid that outcome.

[5] *See, P.C. of Yonkers, Inc. v. Celebrations! The Party And Seasonal Superstore*, No. CIV.A.04-4554 JAG, 2007 WL 708978, at *8 (D.N.J. Mar. 5, 2007) (denying dismissal where "Plaintiffs have clearly alleged how Defendants purposely and/or knowingly took their data, and how Plaintiffs were damaged []").

[6] "Computer" is "an electronic device [] capable of executing a computer program [...] and includes all computer equipment connected to such device []." N.J.S.A. § 2A:38A-1(b). "Computer network" is "the interconnection of communication lines [...] with a computer through remote terminals, or a complex consisting of two or

  b. unauthorized altering, damaging, taking or destroying of a computer, computer system or computer network;

  c. unauthorized accessing or attempt to access any computer, computer system or computer network;

  d. unauthorized altering, accessing, tampering with, obtaining, intercepting, damaging or destroying of a financial instrument; or

  e. accessing and reckless altering, damaging, destroying or obtaining of any data, data base, computer, computer program, [software, equipment, system or] network.

Each subsection of CROA establishes an independent basis for liability requiring "purposeful or knowing" mental state. *Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*, 191 N.J. 460, 469 (2007). Subsections (a)-(d) require "unauthorized" conduct, however subsection (e) permits a claim for access and "reckless" conduct (regardless of authorization), which denotes a different level of state of mind. *See State v Simon*, 161 N.J. 416, 464 (1999) ("Recklessness […] distinguished from purposely and knowingly based on the degree of certainty involved."). Purposeful and knowing "states of mind involve near certainty, while recklessness involves an awareness of a risk that is a probability rather than a certainty." *Id.* Thus, CROA's framework allows liability to attach not only when an actor deliberately and without

---

more interconnected computers" and a "computer system" is "a set of interconnected computer equipment intended to operate as a cohesive system." *Id.* §§ 1(d); (g). DarkOwl's computers, network and systems meet these definitions.

authorization accesses, takes, or damages, but also when an actor's reckless conduct causes business or property harm.

### A. Atlas Violated CROA Through Its Actions

Atlas purposely engaged in at least four separate violations of CROA: it (1) accessed DarkOwl's computer systems without authorization, (2) took data from DarkOwl without authorization, (3) accessed and recklessly obtained data from DarkOwl, and (4) accessed and damaged DarkOwl's computer system and network in a reckless or unauthorized manner. The first three violations fall under sections (a), (c), and (e) of the statute and are based on Atlas's intentionally gaining access to DarkOwl's platform and taking its data.[7] The fourth violation satisfies sections (b), (c), and (e) and is based on Atlas's intentional scheme to delay sending emails until it had sufficient numbers to create a DDoS attack against DarkOwl. Atlas took these actions to access, take, obtain, and damage DarkOwl's data and computer systems in a purposeful, knowing, and reckless manner. Atlas did not merely cut corners to bring this lawsuit; it violated New Jersey law and should not be permitted to benefit from its own misconduct.

---

[7] DarkOwl provides the statutory provisions Atlas violated for clarity purposes. At this stage, however, DarkOwl need not identify with specificity the precise CROA sections that Atlas violated for the court to deny Atlas's motion to dismiss. *P.C. of Yonkers, Inc. v. Celebrations! The Party & Seasonal Superstore, L.L.C.*, 2007 WL 708978, at *8 (March 2, 2007) ("notice-pleading standard of Rule 8(a)(2) does not require that a plaintiff plead specific subsections of a statute[].").

Atlas attempts to narrow CROA to cover only so-called "anti-hacking" conduct, but the statute is not so limited. Although CROA prohibits hacking, it covers much broader conduct as detailed in the statute and recognized by the courts. *See Auto. Res. Mgmt. LLC v. Favo*, No. CV 21-2630 (SRC), 2022 WL 1080991, at *3-4 (D.N.J. Apr. 11, 2022) (granting summary judgment where defendant accessed emails containing confidential information during employment, but was not authorized to send said emails to her personal email address); *Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.,* 665 F. Supp. 2d 488, 456 (D.N.J. 2009) ("[S]imply because plaintiffs had access [to the information], they had no more authority to take files than they would if they had a key to defendant's building, secretly entered it, and copied paper files") (cleaned up) (vacated on other grounds). Indeed, a New Jersey court has already denied Atlas's motion to dismiss a CROA claim as a result of Atlas's conduct. *See Atlas Data Corp v. REIPRO, LCC*, Dkt. No. MRS-L-231-24, February 21, 2025 Opinion and Order. (*See* Purcaro Certification, **Exhibit A**).

### i. *Atlas Accessed DarkOwl's Computer Systems, Took Data Without Authorization, and Obtained DarkOwl's Data Recklessly*

Atlas knowingly and purposely accessed DarkOwl's platform and took data without any authorization, which caused damage to DarkOwl. Without more, this is sufficient to state a CROA violation. N.J.S.A. § 2A:38A(c). But there is much more.

DarkOwl's platform is strictly for vetted, contractual, authorized customers. Atlas is not a customer of DarkOwl, and DarkOwl did not consent to Atlas's access.

As such, Atlas was not authorized to access DarkOwl's platform and was not authorized to access or take the data therein. Atlas purposely and knowingly bypassed vetting and contractual requirements. Atlas's own Complaint shows screenshots that prove DarkOwl's point: Atlas accessed DarkOwl's systems and took or obtained data in violation of CROA. Complaint ¶ 38.

Atlas demands DarkOwl provide the exact credentials or endpoints Atlas used to gain unauthorized access to, and take data from, DarkOwl's platform. This is akin to requiring a home invasion victim to detail exactly what tools the thief used to access the house and steal valuable property in advance of charging the thief found inside. Rule 8(b) does not require such burden shifting or specificity on the part of the victim. *See Ferring Pharms. Inc., v. Watson Pharms., Inc.*, No. 2:12-cv-05824, 2014 WL 12634303, at * 6 (D.N.J. Aug. 14, 2014) (denying motion to dismiss where counterclaim defendant accessed a highly restricted and available only through invitation Webcast by allegedly evading password protections through unknown means at the time of filing, and, by doing so, acted purposely or knowingly).

Atlas's argument that CROA requires proof of some other activity with the misappropriated information is a misreading of the statute. The statute sets forth five different liability provisions; none require proof of illicit activity with misappropriated information. Rather, as the very cases Atlas cites point out, CROA

requires "damage[] in business or property" --- a standard DarkOwl has sufficiently pled. Atlas cannot require more, when the plain text of the statute does not.

Atlas's claim that DarkOwl failed to allege a violation of its terms and conditions is both incorrect and irrelevant. As pled in the Counterclaim, DarkOwl's platform and data are restricted to vetted customers that must sign contractual agreements and complete a consultation with DarkOwl to access its platform. DarkOwl does not allow a user to simply sign up for an account and get access to the platform by clicking on a "Terms of Service" box, nor can one unilaterally access the DarkOwl platform from the web. Atlas treats DarkOwl as a run-of-the-mill data broker instead of a well-respected partner with cybersecurity companies, law enforcement, and the intelligence community that is in the business of public safety. In any event, Atlas knowingly bypassed the terms and contract requirements.

To the extent Atlas disputes authorization, that is a fact-intensive defense and not suitable for resolution here. *See Rodgers Grp., LLC v. Lewis*, No. CV 22-482 (MAS) (TJB), 2022 WL 4095785, at *22-23 (D.N.J. Sept. 7, 2022) (finding it inappropriate to decide fact-specific inquiries about authorization on the pleadings)[8]

---

[8] Defenses to claims cannot justify dismissing such claims. The Third Circuit has clearly stated that "an affirmative defense may not be used to dismiss a [] complaint." *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 277 (2004). This rule reflects the fundamental principle that courts "will not rely on an affirmative defense… to trigger dismissal of a complaint under Rule 12(b)(6)." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (2007). The rationale is straightforward: on a motion to dismiss for failure to state a claim, "all well-pleaded material fact allegations are

Even if Atlas could manufacture a factual dispute about authorized access at this point – which it cannot – that would not be the end of the inquiry. Subsection (e) only requires that Atlas *access* and "alter[], damag[e], destroy[] or obtain[]" DarkOwl's data or computers/systems is a reckless manner. *See* and *compare* N.J.S.A. § 2A:38A-3(e) (removing the word unauthorized) *with id.* §§ (a)-(d); *see also Astor Chocolate Corp. v. McCall*, No. 3:16-CV-5010-BRM-TJB, 2017 WL 2364197, at \*11 (D.N.J. May 31, 2017) (denying dismissal where plaintiff accessed computer during employment and took information, without authorization or in a reckless manner, finding that "at minimum, [defendant] sets forth a cause of action under N.J.S.A. § 2A"). DarkOwl's pleadings certainly meet that standard. Since DarkOwl's platform is not available to the public and cannot be accessed directly through any legal means available to Atlas, the fact that Atlas somehow obtained the data certainly lends itself to — at the very minimum — the inference of reckless conduct. Discovery will provide the granular details of Atlas's scheme.

Atlas's speculation about hypothetical "lawful alternatives" is, again, a defense to the claim and irrelevant to the instant motion to dismiss.[9] It is well settled

---

taken as true…." *Hauptmann v. Wilentz*, 570 F. Supp. 351, 364 (1983). Because affirmative defenses "generally depend on extrinsic facts," courts must "tread warily, dismissing under Rule 12(b)(6) only when the plaintiff has effectively pled itself out of court." *Gaetano v. Gilead Sciences, Inc.*, 529 F. Supp. 3d 333, 348 (2021).

[9] This is an affirmative defense to the CROA claim. As noted above, an affirmative defense cannot justify dismissing a well pleaded violation of law.

that all favorable inferences are in favor of the nonmovant on a motion to dismiss. Competing inferences cannot defeat plausibility, and the Court should not weigh these competing inferences. *See Princeton Univ.*, 30 F.4th at 344 (collecting cases); *and see Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016) (at pleading, plaintiff not required to engage in explanations rebuttal).

### ii. *Atlas Accessed and Recklessly Damaged a Computer System via a Mass Email Campaign*

CROA prohibits purposive and knowing access in a reckless manner resulting in damage to a computer system or network. N.J.S.A. § 2A:38A-3. "[R]ecklessness involves an awareness of a risk that is a probability rather than a certainty." *Simon*, 161 N.J. at 464. Importantly, CROA includes the concept of communication with a computer as part of its definition of "access." N.J.S.A. § 2A:38A-1(a) ("access" is "instructing, *communicating* with, storing data in, retrieving data from, or otherwise using any computer resources") (emphasis added).

Atlas engaged in communications with DarkOwl's computers that violated CROA through its spam attack. Atlas purposely waited until it amassed over 19,000 "assignors" and knowingly transmitted ~48,000 emails during holidays.

Atlas acted precisely, and recklessly, to overload and "to fraudulently, purposely, and knowingly harm" DarkOwl's systems. Counterclaim ¶ 44. DarkOwl pled damage to its systems and disruptions which resulted from Atlas's attack and

15

necessary remedial response to same, e.g. "expenditure of resources in response to the attack."[10] *Id.* ¶ 31. Such impact was certainly foreseeable.

Atlas acted in a similar manner with other defendants and such conduct was held to adequately state a claim under the CROA. *See Atlas Data Corp v. REIPRO, LCC*, Dkt. No. MRS-L-231-24, February 21, 2025 (Purcaro Cert., Exhibit A). In *Reipro*, the defendant alleged that Atlas waited until there were thousands of takedown requests and intentionally transmitted thousands of takedown emails to defendant's computer system and computer network within a few hours to cause business disruption and damage. *Id.* at 21-22. The court found these allegations sufficient to support a violation of N.J.S.A. § 2A:38A-3(e) through "the purposeful or knowing accessing and reckless altering, damaging, destroying or obtaining of any data, data base, computer, computer program, computer software, computer equipment, computer system or computer network." *Id.* at 22-23. So, too, here Atlas engaged in similar conduct against DarkOwl, violating the CROA.[11]

---

[10] Courts consistently recognize that high-volume messaging campaigns constitute actionable damage to computer systems, even under more restrictive and narrowly drawn statutes. *See, e.g.*, *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295 (6th Cir. 2011) (deliberate messaging barrage diminished system capacity and supported claims under the Computer Fraud and Abuse Act ("CFAA")); *United States v. Carlson*, 209 F. App'x 181 (3d Cir. 2006) (mass email "clogs" to another's inbox resulted in system impairment, prompting CFAA liability); *Fidlar Techs. v. LPS Real Estate Data Solutions, Inc.*, 810 F.3d 1075 (7th Cir. 2016) (damage, under CFAA, may include less obvious invasive conduct, such as flooding of an email).

[11] It is no defense to suggest that a technologically sophisticated actor like DarkOwl is capable of handling enormous amounts of data. DarkOwl has alleged harm as a

## B.    Damaging Business or Property Is Plausibly Pled

DarkOwl sufficiently pled Atlas's conduct "damaged [its] business or property" within the meaning of CROA. CROA allows claims for any amount of damage. *Compare* N.J.S.A. § 2A:38A-3 *with* 18 U.S.C. § 1030(4).

CROA specifically provides that "the value of any property or services, including the use of computer time, shall be their fair market value if it is determined that a willing buyer and willing seller exist. Alternatively, value shall include, but not be limited to, the cost of generating or obtaining data and storing it within a computer or computer system." N.J.S.A. § 2A:38A-2. Thus, the statute contemplates alternate methods for quantifying damages to business or property. Indeed, based on Atlas's similar conduct in *Reipro*, the court found that the resulting business damages were both foreseeable and sufficiently pled to defeat a motion to dismiss.

> Defendant pleads that Plaintiff Atlas intentionally transmitted thousands of takedown emails to their computer system and computer network within a few hours. Defendant further pleads that by waiting until there were thousands takedown request and sending the requests within a few hours that Atlas intended to overwhelm and disable their computer system and computer network thereby making it impossible for them to timely comply with the takedown requirement of Daniel's Law and

result, and detailed same, and its allegations must be taken as true. Further, DarkOwl's main objective is helping law enforcement and cybersecurity professionals protect the public. It does not follow that its technological sophistication in that area translates into avoiding harm due to a malicious holiday timed DDoS-style attack on its systems.

> inhibiting their ability to serve their customers. Defendant further alleges that it was foreseeable that by sending thousands of emails within a few hours that Defendant's computer system would be disabled and that their system would be damaged. Based on these allegations, the court can glean a cause of action for violation of N.J.S.A. § 2A:38A-3(e).

*REIPRO*, Dkt. No. MRS-L-231-24, at 21.

The impact of Atlas's actions resulted in damage to DarkOwl' business and property, including operational and business disruption flowing from Atlas's conduct, system and email impairment, emergency responses, diversion of personnel and resources, lost customers and prospects, revenue loss, and reputational harm. The harm to DarkOwl's business and related damages and losses were foreseeable given Atlas's calculated behavior. These allegations satisfy CROA's business or property damage requirement, with the full extent of damage proven at trial.

Atlas claims of "inadequate allegations of damaging computer data" is unavailing as not required by CROA. To the extent Atlas claims DarkOwl did not sufficiently allege damage, it is incorrect on both the law and the facts. First, CROA makes clear that a "person or enterprise *damaged in business or property* as a result [...] may sue the actor." N.J.S.A. § 2A:38A-3 (emphasis added). New Jersey courts do not require a certain quantum of damage, it is sufficient to allege examples of business or property damage; a bar that DarkOwl has easily met. *C.f. In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 277 (3d Cir. 2016) (affirming

18

dismissal of claim where plaintiff alleged *only* unjust enrichment, an injury not contemplated by CROA, and could not allege *any* damage to property or business). Second, Rule 8 does not require damages to be pled with particularity or proven in advance of discovery. *See Connelly,* 809 F.3d at 788-89 ("For the purposes of pleading sufficiency, a complaint need not establish a prima facie case in order to survive a motion to dismiss. A prima facie case is an evidentiary standard, not a pleading requirement.") *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (stating a plaintiff, at the pleading stage, "is not required to go into particulars").

Finally, Atlas's arguments tend to rely on the federal statute, CFAA, not New Jersey's CROA. However, DarkOwl does not claim violations of the CFAA and indeed, the statutory language and required elements of the two laws are different. For example, the CROA allows for broader damages than the CFAA. *See CC Ford Grp. W. LLC v. Johnson*, C.A. No. 22-4143 (MAS)(TJB), 2025 WL 1810206, at *55 (D.N.J June 30, 2025) ("CROA allows for a broader allegation of damages than the CFAA, which can include losses unrelated to the damage or impairment of a computer system") (internal quotes and cite omitted). Thus, Atlas's reliance on the federal statute in an attempt to dismiss the state CROA claims are, at best, misplaced.

Unlike the plaintiff in *Bramshill v. Pullen*, No. cv 19-18288, 2020 WL 4581827 (D.N.J. Aug. 10, 2020), which Atlas mainly relies upon, DarkOwl alleges

concrete, non-speculative categories of harm tied directly to Atlas's conduct. The fact that some of business damage DarkOwl pled appeared later in time (e.g., lost business opportunity with New Jersey law enforcement) does not dimmish the fact that DarkOwl was damaged by Atlas's conduct in violation of CROA.[12] Any dispute over the extent, quantification, or causation of damages is a merits issue – not a basis for dismissal under Rule 12(b)(6). Accordingly, this Court should deny Atlas's motion to dismiss thereby declining to insulate Atlas from liability given that it knowingly, purposely, and recklessly engaged in conduct to access, take and obtain data, and damage DarkOwl's computer system in violation of CROA.

## II.    DarkOwl Alleges a Colorable Claim for Relief for Tortious Interference

Under New Jersey law, the elements of tortious interference with a prospective business are: (1) reasonable expectation of economic benefit or a contract, (2) which was lost as a result of [Atlas's] malicious interference, and (3) that [DarkOwl] suffered losses as a result. *Avaya Inc., RP v. Telecom Labs, Inc.,* 838 F.3d 354, 382 (3d Cir. 2016); *Printing Mart*, 116. N.J. at 750–52 (1989).

### A.    Reasonable Expectation of Economic Benefit is Plausibly Pled

---

[12] Indeed, it is common for business or property damage to occur well after the unauthorized access violation. For example, when a hacker surreptitiously accesses a computer system without authorization and discloses stolen data months later, they are not absolved of liability merely because they waited to damage the business.

DarkOwl has sufficiently alleged facts supporting a reasonable expectation of economic benefit. In a pleading, a party need only allege enough facts to show a protective right (a prospective economic or contractual relationship) giving rise to some "reasonable expectation of economic advantage." *Printing Mart*, 116. N.J. at 751. Prospective economic relationship is defined broadly under New Jersey law and may include "even the voluntary conferring of commercial benefits in recognition of a moral obligation" or "any other relations leading to potentially profitable contracts." *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 195 (3d Cir. 1992); *see also Printing Mart*, 116 N.J. at 753-755 (finding a reasonable expectation of economic benefit where the plaintiff alleged ongoing and expected sales to the public at large; protected right is "plaintiff's right to pursue business").

DarkOwl is not required to provide a blow-by-blow detail of all the customers and business that DarkOwl lost due to Atlas's conduct. In a pleading, DarkOwl need only allege "facts that show an existing or prospective [] economic relationship" by asserting more than it simply "lost business." *Austar Int'l, Ltd. V. Austarpharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J 2019); *c.f. N.J. Physicians United Reciprocal Exch v. Boynton and Boynton, Inc*., 141 F. Supp. 3d 298, 310 (D.N.J. 2015) (granting motion to dismiss where counterclaim plaintiff alleged only "unknown prospective clients" without further information to glean a prospective economic relationship). In contrast to *N.J. Physicians*, here, DarkOwl pled much more than unknown

prospective clients and indeed provided sufficient information as to economic relations which have been specifically curtailed by Atlas's conduct.

For example, DarkOwl alleges existing and prospective customer relationships with several entities in New Jersey. Indeed, DarkOwl has business and contractual relationships with, for example, certain law enforcement, cybersecurity professionals, and government agencies. Atlas, as detailed in its own Complaint, asserts that DarkOwl had business relationships in New Jersey. Complaint ¶ 35. DarkOwl was clear in its counterclaims about the specific type and category of customers that Atlas interfered with, i.e. New Jersey police and law enforcement agencies and cybersecurity professionals based in New Jersey. These are identifiable categories of prospects and not merely "unknown prospective clients".

Atlas argues that DarkOwl needs to list specific customers at the pleading stage. New Jersey courts continue to reject this argument, even after *Iqbal/Twombly*. *See, e.g., Intervet, Inc. v. Mileutis, Ltd.*, No. CV151371FLWTJB, 2016 WL 740267, at *8 (D.N.J. Feb. 24, 2016)  (finding "under the liberal notice pleading standard of Federal Rule of Civil Procedure 8(a), it is not required to identify specific lost customers or contracts"); *Heartland Payment Sys., LLC v. Carr*, No. 318CV09764BRMDEA, 2021 WL 302918, at *7 (D.N.J. Jan. 29, 2021) ("At the pleading stage, a plaintiff *does not* need to allege *specific* prospective customers or contracts to show a reasonable expectation of prospective economic benefit.")

22

(internal quotations omitted) (emphasis added). In any event, DarkOwl provided specific types of customers and business impacted, which provides more than adequate fair notice to Atlas.

### B.    Malicious Interference by Atlas is Sufficiently Pled

DarkOwl sufficiently pled malicious interference. "The second element — malicious interference — requires only the intentional doing of a wrongful act without justification or excuse. *Avaya Inc.,* 838 F.3d at 383 (internal quotations and citations omitted). "Wrongful conduct, always viewed in the specific context of the case […], is generally defined by reference to custom in the industry. It is conduct that would not be sanctioned by the rules of the game." *Id.; Printing Mart*, 116. N.J. at 756-57. "Malice is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." *Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 679 F. Supp. 3d 53, 111 (D.N.J. 2023) (internal quotations and citation omitted). The requisite intent "may be either a specific intent to interfere with a contract *or the taking of improper action with the knowledge that interference will probably result*." *Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 49 (App. Div. 1997) (emphasis added). "The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal and thereby interferes with a competitor's economic advantage." *Lamorte & Co. v. Walters*, 167 N.J. 285, 307 (2001) (citations omitted); Moreover, at the pleading stage, alleging Atlas "acted out

of [its] own self-interest at the expense of [the plaintiff] are sufficient assertions of intent and malice." *Austar Int'l Ltd.* 425 F. Supp. 3d at 359.

Here, Atlas curated preset target lists that fraudulently identified DarkOwl as a "data broker website[]" and launched its email attack accordingly. Atlas knew what it was doing. Atlas intentionally and purposely aimed to impede DarkOwl's ability to serve its customers by flooding systems via emails and did so with the aid of Atlas's misrepresentations of DarkOwl's business. This conduct was designed to benefit Atlas by purposely frustrating the 10-day compliance period and creating claims for itself. Atlas's conduct is particularly egregious given that Atlas held onto requests of "assignors," for nearly six months, until it had a crucial mass and then launched the email attack in a manner designed to create confusion for and interference with DarkOwl, an entity committed to public safety. Atlas's self-interested motives both harmed DarkOwl and put individuals, including Covered Persons, at more risk by (among other things) sabotaging DarkOwl's ability to conduct business, service customers, and work with New Jersey law enforcement.

### C.    Resulting Losses is Plausibly Pled

DarkOwl plausibly pled resulting losses caused by Atlas's conduct. "[T]o establish the third element, loss and causation, there must be proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Avaya Inc.,*

838 F.3d at 383; *Printing Mart,* 116. N.J. at 759 (collecting cases). "[I]t is sufficient that plaintiff prove facts which, in themselves or by the inferences which may be legitimately drawn therefrom, would support a finding that, except for the tortious interference by the defendant with the plaintiff's business relationship with [another party], plaintiff would have consummated the sale and made a profit." *Avaya Inc.*, 838 F.3d at 383. At the pleading stage, plaintiff need only sufficiently allege that there is a reasonable probability that without the interference it would have received the anticipated economic benefit of more clients for its services; such actual proof is reserved for trial. *ADP, LLC v. Ultimate Software Grp., Inc.,* No. CV168664KMMAH, 2018 WL 1151713, at *6 (D.N.J. Mar. 5, 2018)

DarkOwl pled actual and foreseeable losses that would not have occurred but for Atlas's tortious interference. DarkOwl identifies specific categories of business, relationships, and profit losses — including losses from business with New Jersey law enforcement agencies and cybersecurity professionals — and details the contemporaneous business impacts caused during, after, and as a result of Atlas's campaign. Atlas's actions resulted in lost revenue and customers. The rapid, unexpected DDoS-style email flood forced DarkOwl to divert resources and disrupted normal operations, caused harm to DarkOwl's system, and caused financial harm. These foreseeable and non-speculative business losses pled go well beyond mere conjectural harm.

Atlas disingenuously suggests that DarkOwl's own actions are the cause of the lost economic opportunity. The fact that Atlas's conduct forced DarkOwl to take responsive steps to address Atlas's interference and prevent further harm does not sever causation; rather, it bolsters it; such responses are a foreseeable consequence of Atlas's conduct and do not break causation or render the losses "voluntary."

Atlas's reliance on *Woodend v. Lenape Regional High School Dist.,* 535 Fed. App'x 164, 167-68 (3d Cir. 2013), and *B&M Auto Salvage & Towing, LLC v. T'ship of Fairfield,* C.A. No. 11–2107, 2013 WL 5434717, at *7 (D.N.J. Sept. 13, 2013) is misplaced. In *Woodend*, the plaintiff resigned from his job and the court ruled that he did not possess a protectable right to future employment, i.e. protectable right of future employment did not survive voluntary resignation. By contrast, here, DarkOwl's protectable right is its ability to contract with and continue to provide services to its customers, including New Jersey law enforcement. That protectable right exists, and Atlas's illicit actions interfered with it. *B&M* is easily distinguished as that case was decided at summary judgment where the Court found no evidence that the defendant caused cancellation of plaintiff's sale contract. While the Court mentioned that plaintiff cancelled the contract, there was no evidence that cancellation was due to the defendant's conduct – a clear difference with the allegations pled by DarkOwl.

## III.    Atlas's Engaged in at Least Three Fraudulent Schemes Against DarkOwl

DarkOwl sufficiently pled all elements to state a claim for relief against Atlas for fraud. The five elements of common-law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 25 (D.N.J. 2020). (internal quotations and citation omitted).

Atlas made at least three different material representations and/or acted in a deceptive manner with the knowledge or belief of the falsity of those representations: (1) DarkOwl is a data broker; (2) the emails it created and launched as part of its DDoS-style attack were all valid and from "Covered Persons"; and (3) Atlas gained access to DarkOwl's restricted, non-public platform and data using deception or other illicit means by, for example, misrepresenting its identity, authority, or purpose, or by inducing a third party to provide access under false pretenses. In all three scenarios, Atlas intended that there be reasonable reliance on these misrepresentations or omissions that caused damage to DarkOwl. Taken together, or individually, each of these scenarios is sufficient to satisfy Rule 9(b)'s pleading standard and the elements of common law fraud.

DarkOwl satisfied the requisite particularity with its fraud allegations. "[Fed. R. Civ. P.] 9(b) imposes a heightened pleading requirement for allegations of fraud[.]

27

[It] requires that in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." *Caspersen*, 441 F. Supp. 3d at 35. (internal quotations and citations omitted). "The [party] need not, however, plead the date, place or time of the fraud, so long as they use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* at 35-36; *Rolo v. City Inv. Co. Liquidating Trust*, 155 F.3d 644, 658 (3d. Cir. 1998) (abrogated on other grounds). Under this standard, the pleading must "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [defendant's] are charged" *Grant v. Turner*, 505 Fed. Appx. 107, 111 (3d Cir. 2012) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Caspersen*, 441 F. Supp. 3d at 36. Particularity of action is required; however, mental elements may be alleged generally. *Id.* at 35. At Rule 9(b), DarkOwl need not append every statement and audience — the allegations give Atlas fair notice of the fraud it committed and the adverse effects on DarkOwl. *See Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). (The purpose of Rule 9(b) is to provide adversaries with fair "notice of the precise misconduct with which they are charged.").

28

**Materiality:** Material is something that has "a natural tendency to influence, or be capable of influencing, [a decision]." *See Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 182 (2016); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). A material fact is one that "a reasonable man would attach importance to [..] in determining his choice [..]; or [..] if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice [..], even though a reasonable person would not." *Universal Health Services, Inc.*, 579 U.S. at 193.

**Knowledge:** The knowledge or belief of falsity is referred to as the "scienter" element of fraud. "To show scienter, a plaintiff must plead allegations showing that the defendant was, at least, reckless: This scienter standard requires plaintiffs to allege facts giving rise to a strong inference of either reckless or conscious behavior." *Caspersen*, 441 F. Supp. 3d at 39 (internal quotations and cites omitted). The inference need not be irrefutable, i.e. of the "smoking gun" genre, or even the most plausible of inferences. *Id.* at 40. "The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Ibid.*

"Rule 9(b) expressly provides that [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Pleading circumstantial grounds for such knowledge is sufficient to meet the Rule 9(b) standard." *Ibid.*; *see*

29

*Chaudhri v. Lumileds LLC,* No. CV182167KMCLW, 2018 WL 6322623, at *9 (D.N.J. Dec. 3, 2018) ("Mental elements of a cause of action must ordinarily be proven circumstantially, and even Rule 9(b) permits intent to be pled generally.").

**Intent & Reliance:** The intention that the receiving party rely on the misstatement and resultant reliance under fraud are intertwined. Intent may be established by circumstantial evidence and inferred from a party's knowing misrepresentation made for the purpose of influencing another party's decision. *See, e.g., Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 625 (1981). "Rule 9(b) permits intent to be pled generally." *Chaudhri*, 2018 WL 6322623, at *9. "A plaintiff alleging deceit must establish that he or she relied on a defendant's misrepresentation and that those misrepresentations were a proximate cause of the damage." *Caspersen*, 441 F. Supp. 3d at 40 (internal quotations and citations omitted). "The presumption or inference of reliance and causation, where omissions of material fact are common [], has been extended in the context of both common law and statutory fraud." *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 332 N.J. Super. 31, 50 (App. Div. 2000).

Reliance may be alleged through direct *or* indirect reliance. "Under New Jersey law, the theory of indirect reliance allows a plaintiff to maintain a fraud action based upon a statement the plaintiff heard not from the party that defrauded him [] but from that party's agent or from someone to whom the party communicated the

false statement with the intention that the [plaintiff] hear it, rely on it, and act to his [] detriment." *Mortellite v. Novartis Crop Prot., Inc.*, 460 F.3d 483, 492 (3d Cir. 2006) (internal quotations and citations omitted.)

Whether a plaintiff relied on a misrepresentation, and whether that reliance was reasonable, is a question of fact best reserved for the jury. *Automated Salvage Transp., Inc. v. NV Koninkliijke KNP BT*, 106 F. Supp. 2d. 606, 625-26 (D.N.J. 1999); *Caspersen*, 441 F. Supp. 3d at 41. At this stage, it is enough to plead reliance – which DarkOwl has done.

**Damages:** "Like materiality and reliance, proximate cause is typically an issue of fact." *Geherty v. Moore*, 238 N.J.Super. 463, 479 (App. Div. 1990) (vacated on other grounds). Damages need not be pled with specificity. It is sufficient to show that the plaintiff was harmed as a result of the defendant's fraudulent conduct or false statements. *See Avaya Inc.,* 838 F.3d at 388 (noting that proof of damages can be inferred where "a defendant's actions reduced the plaintiff's profits, although by an uncertain amount.") (internal quotations and citations omitted).

### A.    Atlas's Falsely Represented that DarkOwl is a Data Broker

DarkOwl pled with particularity that Atlas made materially false and misleading representations regarding DarkOwl's business practices, data collection methods, and legal compliance.

31

Atlas represented to "assignors," to DarkOwl, and to others that DarkOwl is a "data broker" with a "people search website" making personal data available "on the web"—which is false. These misrepresentations were made, among other places, on Atlas's website and in its communications with both its assignors and its emails to DarkOwl, beginning in or about June of 2023 and December 30, 2023 respectively. Atlas knew that DarkOwl was not, and is not, a data broker. Yet, Atlas repeats these false assertions in its Complaint. Complaint ¶¶ 3,7, 36. Atlas also knew, at the time it made its false representations, that DarkOwl worked with law enforcement and other cybersecurity professionals as evidenced by the inclusion of DarkOwl's website in its Complaint.

Atlas's false statements were made to "assignors" and the public, as seen on Atlas's website, and as part of Atlas's effort to induce takedown requests against DarkOwl, portraying DarkOwl as unlawfully publishing personal data and operating outside legal bounds. Indeed, Atlas's business model depends on inducing "assignors" to request that Atlas send takedown notices or enforcement demands, knowing—and intending—that those demands would be transmitted to DarkOwl and would compel DarkOwl to act in reliance on the underlying misrepresentations. These false statements were made beginning at least in about June of 2023 through December of 2024 and beyond.

A reasonable person would plainly attach importance to representations bearing on the legality of a data provider's operations and whether remedial action—such as a takedown demand — was warranted. Moreover, if Atlas was truthful with the "assignors" about the work DarkOwl actually did — namely, working with law enforcement to keep them safe — it is implausible that they would actually ask DarkOwl to "takedown" their information.

Consistent with the doctrine of indirect reliance, Atlas made the material misrepresentations described above about DarkOwl to the public and "assignors," with the intent or expectation that those misrepresentations will be communicated to and relied upon by DarkOwl. Indeed, the emails sent to DarkOwl communicated these material misrepresentations. And DarkOwl did so rely by, among other things, diverting resources, including personnel, and taking action to mitigate further harm.

### B.    Atlas Made False Representations as Part of Its Massive DDoS Email Attack Against DarkOwl

Atlas made false representations to DarkOwl in the massive DDoS-style email scheme it created and launched beginning on Dember 30, 2023 through January 5, 2024, by claiming that the emails were valid requests under Daniel's Law and all from "Covered Persons." For example, (a) the "assignors" were not verified Covered Persons under Daniel's Law, (b) the emails did not satisfy statutory prerequisites by, among other things, failing to include information protected under the law, and (c) were not sent by Covered Persons – but rather autogenerated and transmitted by

Atlas. All these material facts were omitted by Atlas. Atlas's omissions and misrepresentation of material facts are adequately detailed and sufficiently alleged such that Atlas has notice of the facts underlying the fraud it perpetrated. These facts are material to Daniel's Law compliance and intended to induce action by DarkOwl under a compressed timeframe.

Here, the facts pled give rise to a strong inference of scienter. Taken individually or collectively, DarkOwl demonstrated that Atlas knew (or acted with a reckless disregard of the truth) that its representations about and to DarkOwl were false or misleading. Atlas knew what it was doing and the Counterclaims plausibly allege Atlas's actual awareness of its misrepresentations.

Atlas suggests that failure to verify does not demonstrate scienter. Atlas is wrong. Such willful blindness satisfies the fraud scienter requirement. *See United States v. One 1973 Rolls Royce*, 43 F.3d 794, 808) (3d. Cir. 1994) (holding that "willful blindness is a subjective state of mind that is deemed to satisfy a scienter requirement of knowledge"); *see also United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1991) (willful blindness equated with the concept of "deliberate ignorance" and treated a state of mind equally culpable as actual knowledge). Atlas cannot insulate itself from fraud liability by structuring its process to avoid learning disqualifying facts while continuing to represent that statutory requirements were met. This was a structural decision that Atlas made so that it could avoid exactly this

scenario. The law does not permit a party to "close its eyes" to the truth and then claim lack of knowledge when the deception predictably induces reliance. *United States v. Wert-Ruiz*, 228 F.3d 250, 255; 258 (3d Cir. 2000 ) (affirming willful blindness instruction where the actor "subjectively believes there's a high probability of a fact" and "deliberately avoids" confirming it).

DarkOwl satisfied "[t]he presumption or inference of reliance and causation" due to Atlas's "omissions of material fact[s]" as described above. *See Varacallo*, 332 N.J. Super. at 50. Atlas made the material misrepresentations described above with the intent or expectation that those misrepresentations or omissions be communicated to and relied upon by DarkOwl. Indeed, Atlas's fraudulent scheme depends on overwhelming a company with thousands of emails, some from individuals who may not actually be Covered Persons and duplicated for information which may or may not be protected information under the law. Atlas, through its purposely inflated spam transmissions directly communicated the misrepresentations and intended DarkOwl to rely on same contained in its mass email flood, thereby frustrating the statutory compliance period and disrupting business operations. And DarkOwl did so rely.

## C.    Atlas Gained Access to DarkOwl's Platform and Obtained Data via Fraud

Atlas used deception to gain access to DarkOwl's restricted, non-public platform and data — by misrepresenting its identity, authority, or purpose, or by

35

inducing a third party to provide access under false pretenses.[13] As explained in detail above, *supra* Section I(A)(i), Atlas is not a customer of DarkOwl and is not authorized to access DarkOwl's platform nor the restricted data, yet it nonetheless purposely and knowing accessed and obtained such data at some point prior to the October 16, 2024, filing of its Complaint – as evidenced by the impermissibly obtained screenshot contained therein. Where access is conditioned on vetting, subscription, and purpose limitations, any false statement or concealment used to bypass those controls is material.

Atlas knew it lacked authorization to access DarkOwl's systems and data and therefore employed deceptive means to do so. The allegations describe intentional conduct designed to evade access controls—not inadvertence or a mistake.

### D.      Damages

DarkOwl alleges that it relied upon Atlas's material misrepresentation and was damaged as a result. Atlas's actions caused DarkOwl to divert resources, address public misstatements, and sustain reputational, business and financial harm. Indeed, as detailed above, Atlas's fraudulent conduct caused DarkOwl to lose customers and economic prospects.

---

[13] Rule 9(b) allows such allegations where specifics are in Atlas's possession. Adopting Atlas's argument that dismissal rather than discovery is appropriate would invert the rule. To the extent the Court desires more detailed information about exactly how Atlas achieved unauthorized access, DarkOwl should be permitted to amend after limited discovery.

**IV.    The Civil Conspiracy Claim Is Plausible and Derivative of Viable Torts**

To state a claim for civil conspiracy, a party must allege facts sufficient to permit a reasonable inference of conspiracy conduct. Under New Jersey law, civil conspiracy is a dependent claim requiring an underlying substantive tort, as the heart of the claim is not the unlawful agreement itself but the underlying wrong that would give rise to a cause of action absent the conspiracy. "[C]onspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am.*, 184 N.J. at 177 (internal quotations and citations omitted). The elements are essentially the same as federal civil rights conspiracy claims under Section 1983, requiring "(1) two or more persons conspire to deprive any person of (constitutional rights); (2) one or more of the conspirators performs any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 294 (3d Cir. 2018). "The gravamen of a conspiracy action is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action." *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 301 (D.N.J. 2015). Courts apply the general Rule 8 pleading standard to civil conspiracy claims

37

that do not involve fraud allegations. *Hillsborough Rare Coins, LLC v. ADT LLC*, No. CV 16-916 (MLC), 2017 WL 1731695 (D.N.J. May 2, 2017).

Like the criminal counterpart, allegations of civil fraud need not specifically identify the co-conspirators at the pleading stage, rather the complaint must assert "that the alleged conspirators shared a unity of purpose, the intent to achieve a common goal, and an agreement to work together toward the goal." *U.S. v. Mosberg*, 866 F. Supp. 2d 275, 301 (2011)); *and see* N.J.S.A. § 2C:5-2 (statute does not require identification of all conspirators); *State v. Carbone*, 17 N.J.Super. 446 (1952) (the State need not join all alleged co-conspirators in indictment for conspiracy nor explain why conspirators omitted therefrom were not indicted).

DarkOwl sufficiently alleges Atlas coordinated with other co-participants to flood DarkOwl's systems with approximately 48,000 emails and access its platform and data unlawfully, causing special damages pled in DarkOwl's CROA and tortious interference claims. The dates, times, manner, and motive for these actions are detailed in the sections above related to these claims. At the Rule 12 stage, the court draws reasonable inferences in favor of DarkOwl; this would include the inference of additional actors working with Atlas as alleged and inferred from the coordinated timing and near instantaneous transmission over the New Year's holiday, the inflated volume of emails in the DDoS attack, and nonpublic access artifacts. Because DarkOwl's underlying torts are viable, the conspiracy claim stands as pled. DarkOwl

is not required to allege every fact to be explored and developed through discovery at this stage. As such, Atlas's motion to dismiss DarkOwl's conspiracy count must be denied.

## **CONCLUSION**[14]

As set forth above, DarkOwl's Counterclaims readily satisfy the applicable pleading standards. Atlas's Motion to Dismiss must be denied in its entirety.[15]

Dated February 3, 2026

**GREENSPOON MARDER LLP**

*/s/Kelly Purcaro*
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com
*Attorneys for Defendant Darkowl, LLC*

---

[14] Atlas's argument that it appears "solely as assignee" is, at best, disingenuous. Atlas filed suit, asserting the right to do so as a party. Atlas undertook conduct giving rise to counterclaims. Atlas cannot use assignee status as both a sword and a shield, to sue for damages while insulating its own tortious acts. Rule 13 allows counterclaims arising out of the same occurrence. *See Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d. Cir. 2002) (counterclaims are proper where there exists "a logical relationship" to plaintiffs conduct; "logical relationship[s] ha[ve] been viewed liberally to promote judicial economy"); *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961) (where "multiple claims involve many of the same factual issues, …or where they are offshoots of the same basic controversy between parties, fairness and considerations of convenience and economy require that the counterclaimant be permitted to maintain his cause of action.").

[15] Alternatively, any dismissal should be without prejudice and with leave to amend.